*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2012).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A13-2345**

Monica Peterson,
Respondent,

vs.

A-Z Friendly Languages, Inc.,
Relator,

Department of Employment and Economic Development,
Respondent.

**Filed October 20, 2014
Reversed
Ross, Judge**

Department of Employment and Economic Development
File No. 31378245-3

Monica Peterson, Lakeville, Minnesota (pro se respondent)

Boris Parker, Nicholas M. Wenner, Jordan Wesley Anderson, Parker & Wenner, P.A., Minneapolis, Minnesota (for relator)

Lee B. Nelson, Munazza Humayun, St. Paul, Minnesota (for respondent department)

Considered and decided by Halbrooks, Presiding Judge; Ross, Judge; and Chutich, Judge.

UNPUBLISHED OPINION

**ROSS**, Judge

This appeal concerns whether an unemployment law judge correctly held that an agency that provides interpreter services is obligated to cover its former interpreters as "employees" eligible to receive unemployment benefits. A-Z Friendly Languages, Inc., challenges an unemployment law judge's determination that one of its interpreters and all similarly situated workers are employees rather than independent contractors. We hold that the circumstances demonstrate that interpreter Monica Peterson worked only as an independent contractor. Even if this were not so, the unemployment law judge lacked a sufficient factual basis to extend his ruling to characterize all similar workers as employees. We reverse.

## FACTS

A-Z Friendly Languages contracts with governmental agencies to provide interpretation services through trained interpreters, like Monica Peterson. A-Z holds a roster of interpreters, and when a government agency requests its interpretation services, A-Z will contact a suitable interpreter and offer her the assignment. A-Z informs the interpreter when and where the interpretation session is and the hourly payment rate. Rates vary depending on the language, unique assignment requirements, and other factors. Sometimes interpreters negotiate a different hourly rate. The interpreter is free to accept or reject the assignment. A-Z does not train or certify its rostered interpreters, and the interpreters also are free to work for other interpretation-service agencies.

A-Z also serves as an administrative resource when interpreters make their interpretation appointments independently. Interpreters who arrange their own appointments simply submit verification forms to A-Z for payment. In this situation, A-Z collects the fee from the client and pays the interpreter a "fair market rate," which is usually higher than if A-Z had been the source of the assignment. A-Z pays interpreters every two weeks and withholds no employment taxes.

A-Z's policy declares that an interpreter "works as **an independent contractor**" (emphasis in original) and that each "is responsible for his [or] her own insurances . . . and taxes and is ineligible for any benefits." It requires the interpreter to "strictly follow [A-Z] policies and procedures" when providing interpretation services. It includes a code of ethics for interpreters, obligating them to protect the client's confidential information, translate fully and directly, remain objective, and avoid conflicts of interest. The policy mandates that interpreters dress professionally and appropriately for each assignment and prohibits religious or political insignia on clothing. It also prohibits body scents in medical facilities, echoing the requirement of those facilities.

A-Z imposes other rules. It prohibits interpreters from transporting clients. It requires interpreters to provide their own transportation and obtain their own directions to assignments. It requires them to arrive 10 minutes early and introduce themselves professionally as being "from A-Z Friendly Languages." It prohibits "tight scheduling" and requires each interpreter to notify A-Z if she might arrive late to an assignment. A-Z will stop using an interpreter who is late for two assignments or absent from any. Interpreters may not enter personal residences to interpret without being accompanied by

the client's staff person, and if no staff person is present, interpreters must contact A-Z for instructions. A-Z directs interpreters to wear an A-Z badge. The policy limits when interpreters can operate cell phones, make personal calls, and use computers while they are on the assignment. It requires interpreters to verify that insurance will cover the cost of A-Z interpretation services. Interpreters must report every interpreting assignment. They must do so using A-Z forms, which A-Z requires interpreters to submit within 48 hours of the assignment. A-Z also prohibits interpreters from bringing any persons or pets to the interpretation assignment and does not allow interpreters to find substitutes for their A-Z assignments without A-Z involvement.

Monica Peterson joined A-Z's roster of interpreters in March 2012. Peterson applied for unemployment benefits in late May or early June 2013. The department of employment and economic development determined that she is eligible for benefits because A-Z "ha[s] had an employer-employee relationship with [Peterson] and [is] required to report wages paid to all workers performing similar services."

A-Z appealed the determination. An unemployment law judge (ULJ) began a scheduled telephonic hearing and telephoned Peterson and A-Z to hear evidence. Peterson asked to reschedule. The ULJ never put any witness under oath and never began taking evidence. Peterson nonetheless continued discussing the case. She repeatedly expressed that she was an independent contractor, not an employee. The ULJ eventually rescheduled the hearing.

When the ULJ attempted to contact Peterson by telephone for the rescheduled hearing, Peterson did not answer. A-Z's attorney told the ULJ that Peterson had called

4

A-Z to repeat that she did not want to pursue the unemployment claim. The ULJ decided to hear testimony from the A-Z officers. The ULJ told them that the issue "is whether Ms. Peterson was a covered employee of A-Z Friendly Languages and . . . if so, whether any other individuals providing the same or similar services are also covered employees." The A-Z officers testified substantially to the facts just outlined.

The ULJ held that A-Z exercised so much control over the interpreters that Peterson and others similarly situated are A-Z "employees." A-Z asked the ULJ to reconsider his decision and receive new evidence. The ULJ affirmed his ruling and held that A-Z gave no excuse for not providing the evidence initially. And he reasoned that even if the proffered evidence had been submitted, it would not have led to a different decision.

A-Z appeals by writ of certiorari.

## D E C I S I O N

A-Z argues that the ULJ erred by refusing to reopen the evidentiary hearing, by finding that Peterson was an employee rather than an independent contractor, and by extending the decision to cover all interpreters.

## I

A-Z maintains that the ULJ erred by not holding an additional evidentiary hearing or considering Peterson's unsworn statements during the first scheduled hearing declaring herself to be an independent contractor. We defer to a ULJ's decision not to hold an additional evidentiary hearing, *Skarhus v. Davanni's Inc.*, 721 N.W.2d 340, 345 (Minn.

App. 2006), and we will reverse that decision only when the ULJ abuses his discretion, *Kelly v. Ambassador Press, Inc.*, 792 N.W.2d 103, 104 (Minn. App. 2010).

A-Z contends that the ULJ abused his discretion because he did not follow the statutory requirement to "ensure that relevant facts are clearly and fully developed." *See* Minn. R. 3310.2921 (2013). A ULJ must reopen the hearing only when it appears that not reopening it "would be inconsistent with substantial justice." Minn. R. 1400.8300 (2013). A-Z has failed to show how it was deprived of substantial justice by the ULJ's decision not to reopen the hearing in light of Peterson's previous comments. Peterson's comments have no significant bearing on the issue, and this defeats A-Z's argument that when it engaged in the rescheduled hearing it assumed that Peterson's prior comments were part of the record. A participant's belief about her legal relationship to a contracting entity is irrelevant to whether she served as an employee or an independent contractor. *St. Croix Sensory Inc. v. Dep't of Emp't and Econ. Dev.*, 785 N.W.2d 796, 800 (Minn. App. 2010). We focus instead on the parties' arrangements and conduct. *Id.* Because A-Z's proffered evidence on reconsideration was irrelevant, we cannot say the ULJ abused his discretion by not reopening the record.

## II

A-Z argues that the ULJ erred by finding that Peterson is an employee rather than an independent contractor. An "employee" performs "services for an employer in employment." Minn. Stat. § 268.035, subd. 13(1) (2012). And "employment" exists when "an individual who is considered an employee under the common law of employer-employee and not considered an independent contractor" performs services. *Id.*, subd.

6

15(a)(1). Whether a person served as an employee or an independent contractor is a mixed question of law and fact. *St. Croix*, 785 N.W.2d at 799. We will overturn a ULJ's factual findings only when they are not supported by substantial evidence. *Skarhus*, 721 N.W.2d at 344. When facts are undisputed, however, the determination is a question of law, which we review de novo. *St. Croix*, 785 N.W.2d at 799.

The totality of the circumstances bearing on several factors determines whether an individual is an independent contractor or an employee. *St. Croix*, 785 N.W.2d at 800. We consider the factors "in light of the nature of the work involved." *Guhlke v. Roberts Truck Lines*, 268 Minn. 141, 143, 128 N.W.2d 324, 326 (1964); Minn. R. 3315.0555, subp. 1 (2013) ("[t]he degree of [a factor's] importance may vary depending upon the occupation or work situation . . . and why the factor is present in the particular situation."). The factors we consider include the company's control over the individual's means and manner of performance, the payment method, whether the entity furnishes tools or materials, the entity's control over the premises where the work is completed, and the right of the entity to discharge the worker without incurring liability. *St. Croix*, 785 N.W.2d at 800. The two most important factors are the entity's ability to control the manner and means of performance and its ability to discharge without incurring liability. *Id.* (citing Minn. R. 3315.0555, subp. 1 (2009)). If the listed factors are inconclusive, we may consider other factors. Minn. R. 3315.0555, subp. 1 (2013). Applying this standard, we hold that the ULJ erred by concluding that Peterson was A-Z's employee.

*The Right to Control the Means and Manner of Performance*

We look first at whether A-Z had substantial control over Peterson's means and manner of performance. We do not look mainly at control over what is done but control over how it is done. *St. Croix*, 785 N.W.2d at 800. In doing so, we consider whether A-Z had a *right to control* Peterson's performance, not whether it actually exercised control. *See id.*; Minn. R. 3315.0501, subp. 2 (2013). We determine control "in light of the nature of the work involved." *Guhlke*, 268 Minn. at 143, 128 N.W.2d at 326.

Factors bearing on control generally include whether the company's rules are its own or are instead standards passed down by regulatory agencies or customers, the company's ability "to instruct or direct the method of doing work," "whether regular reports relating to how the services are performed must be submitted to the employer," whether set work hours exist, whether the company provides training, and whether the employer pays job-related expenses. *St. Croix*, 785 N.W.2d at 800–01 (citing Minn. R. 3315.0555, subp. 3 (2009) (now repealed)). Under these measures, we do not agree with the ULJ that A-Z "controls almost every conceivable aspect of an interpreter's actual performance." A-Z controls its interpreters primarily to comply with its client's policies. For example, A-Z requires interpreters to wear professional clothing depending on the setting, but these requirements are passed down by the clients. When asked by the ULJ whether A-Z has "any independent rules that it provides to its interpreters," A-Z's principal answered, "[N]o, there are certain requirements that our customers set" that A-Z interpreters must follow. The ULJ seemingly recognized that A-Z's requirements were passed down from clients, explaining that "no matter who establishes [detailed policies

8

and procedures], [A-Z] adopts those policies as its own." He added, "Because [A-Z's] *adopted* policies . . . control every aspect of an interpreter's performance, the evidence shows that interpreters have little or no material discretion in how they form their interpretive services." (Emphasis added.) Because "general" instructions passed on by the employer from a client generally do not evince control, *St. Croix*, 785 N.W.2d at 802, we do not share the ULJ's reasoning that A-Z's "adopted" policies support its conclusion.

Instructions that relate to the definition of the task—that is, the end product that the client seeks—also do not indicate control. *Id.* at 801; *Neve v. Austin Daily Herald*, 552 N.W.2d 45, 48 (Minn. App. 1996). A-Z's supposedly exhaustive controlling policies are largely instructions of this sort. For example, A-Z requires its interpreters to "render a complete and accurate interpretation . . . without altering, omitting, or adding anything to the meaning," to avoid counseling or advising the non-English speaker, and to refrain from showing emotion. These directives merely define the interpretive task that professional interpreters undertake.

Other circumstances show a lack of A-Z's control. For instance, A-Z does not require its interpreters to file regular reports on how they performed their services; interpreters instead provide a mere service-verification form to administratively track payments and billing. And interpreters may freely decline any A-Z assignment for any reason. A-Z imposes no set work hours and no specific hourly requirement. It provides no interpreter training. Interpreters find their own routes to assignments. They must furnish their own technical equipment and A-Z sets no standard governing interpreter choices about the equipment. A-Z's policies apply only during A-Z interpretation sessions, with

9

no restrictions on interpreters otherwise. The record includes none of the typical indicia of employer control, such as setting lunch breaks, limiting work breaks, obligating workers to accept on-call assignments, and subjecting workers to supervisor instruction and monitoring. And interpreters can accept assignments through competing agencies without A-Z restriction. In sum, the record refutes the ULJ's finding that A-Z exercised substantial employer-like control over Peterson.

*Ability to Discharge Without Incurring Liability*

An entity's ability to discharge a worker without incurring liability generally indicates an employee-employer relationship. *St. Croix*, 785 N.W.2d at 803. Although an entity's ability to discharge without incurring liability during a session may strongly indicate an employee-employer relationship, *see id.* at 803–04, there was no evidence that A-Z has this ability. The testimony indicated that A-Z does not supervise or monitor sessions, so immediate termination is not possible. If a client complains about an interpreter, A-Z chooses whether or not to give the interpreter *future* assignments. This factor does not argue strongly for or against an employment relationship here.

*Mode of Payment*

Another key factor is the mode of payment. Minn. R. 3315.0555, subp. 1(B) (2013). When an entity pays the worker hourly wages rather than a per-job fee, this factor favors finding an employer-employee relationship. *St. Croix*, 785 N.W.2d at 804. The ULJ found that interpreters working for A-Z are paid at a "standard market hourly rate, with some adjustments" and that this mode-of-payment factor therefore indicates an employment relationship. This analysis is flawed. Although the ULJ properly recognized

that an hourly rate usually suggests an employment relationship, he overlooked the indicia of an independent-contractor relationship here. For example, although A-Z pays interpreters on an hourly rate, that hourly rate varies depending on the nature of each job. This does not occur in a typical employment relationship. How the entity treats the compensation for income-tax purposes is also relevant: if the individual is responsible for her own tax obligations, this factor favors independent-contractor status, while an entity's practice of withholding wages to cover income taxes favors an employment finding. *Id.* A-Z requires interpreters to account for their own income taxes and engages in no withholding. The ULJ also appears to have ignored situations in which A-Z can withhold pay. If an interpreter fails to verify insurance coverage (verification that would ensure that A-Z will be paid for its services), A-Z will not pay the interpreter even though she completed that assignment. Similarly, if the interpreter provides a service-verification form that is somehow deficient—such as not being signed by a staff member at the client facility—A-Z can withhold interpreter payment. And if an interpreter violates an A-Z policy, A-Z can penalize the interpreter financially. None of these resembles a usual employment arrangement, and all suggest that A-Z and Peterson engaged in an independent-contractor relationship.

### *Furnishing of Tools or Materials*

The next factor, whether A-Z provided tools or materials, also indicates a contractor relationship. A-Z does not reimburse any interpreter expenses, provides no transportation or directions, and furnishes no materials.

11

*Control Over the Premises Where the Work is Done*

The final factor, control over the premises where interpreters perform their work, suggests the same result. Interpretation takes place at a third-party client's location not controlled by A-Z. Even when the assignment is performed by telephone, the interpreter is not required to work from A-Z's location or use its equipment.

*Conclusion*

The circumstances do not support the ULJ's conclusion that Peterson worked as an A-Z employee. The record instead demonstrates plainly that she worked through A-Z as an independent contractor.

## III

A-Z argues that the ULJ acted outside his authority when he concluded that his decision applied to all interpreters. The department's audit focused only on Peterson; the arrangements of no other interpreters were investigated to assess whether their circumstances differed from Peterson's. So even if the ULJ's extended holding does not depend on the erroneous conclusion that Peterson was an A-Z employee, the holding as to the other interpreters is nevertheless infirm. The ULJ had an insufficient factual basis to determine that all other interpreters were employees.

**Reversed.**